# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

THOMAS C. LINDLEY,    )
    )
        **Plaintiff.**    )
    )
v.    )    **Case No. 04-187-CV-W-GAF**
    )
ALLIED SYSTEMS, LTD; and    )
LOCAL 41 OF THE INTERNATIONAL    )
BROTHERHOOD OF TEAMSTERS.    )

## ORDER

Presently before the Court is a Motion for Summary Judgment filed by the Defendant, Local 41 of the International Brotherhood of Teamsters ("Union"). (Doc. #67). The Plaintiff, Thomas C. Lindley ("Lindley"), filed this action against the Union and his employer, Allied Systems, Ltd. ("Allied"), pursuant to § 301 of the Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 185, seeking damages arising from the termination of his employment. (Doc. #1). The Union contends that it is entitled to summary judgment because Lindley has failed to prove that the Union breached its federal duty of fair representation. (Doc. #68). Lindley opposes this Motion. (Doc. #84). Upon careful consideration of the facts and arguments presented by the parties, the Union's Motion for Summary Judgment is GRANTED.

## DISCUSSION

### I.    Facts

Lindley began working for Allied in October 1989 as a car hauler.[1] As a car hauler, Lindley was responsible for transporting cars and trucks. The Union and Allied are parties to a collective bargaining

---

[1]The following facts, unless otherwise identified, are undisputed. (*See* Doc. #68, #84).

agreement ("CBA").  Allied's car haulers, such as Lindley, are within the bargaining unit of employees covered by the CBA.

The discharge or suspension of a Union employee's employment with Allied is governed by Art. 40 of the CBA.  Pursuant to Art. 40, Sec. 1(a) of the CBA, Union employees will be "subject to discharge" following "major chargeable accidents after full investigation."  The CBA does not specifically define "major chargeable accidents."

The CBA contains detailed procedures for the filing and processing of employee grievances.  The Union and Allied must first attempt to resolve grievances informally.  If these attempts fail, the parties then hold a formal "prehearing" meeting to attempt to resolve the matter.  Grievances that are not resolved at the local level by the Union and Allied may them be presented before a series of arbitration panels.  The first arbitration panel available for Lindley's bargaining unit is an area joint arbitration committee known as the Central Automobile Transporters Joint Arbitration Committee, which consists of equal numbers of representatives appointed by employers signatory to the agreements and other local Teamster Unions signatory to the agreements.  If the matter is not resolved at that level, as in the case of a deadlock, then the grievance can proceed to a national committee known as the National Joint Arbitration Committee, which also consists of equal numbers of members appointed by signatory employers and signatory local unions.  If the matter is not resolved by the national committee, as in the case of a deadlock, then the grievance can be submitted to a Board of Arbitration, consisting of one member appointed by signatory employers, one member appointed by signatory local unions, and a third arbitrator selected jointly by the employer and Union co-chairpersons.  Any decision by the Central Automobile Transporters Joint Arbitration Committee, the National Joint Arbitration Committee and the Board of Arbitration "shall be final

and binding upon the Employer, the Local Union, and the employees." (Doc. #68, Ex. A, pp. Art. 7, Secs. 8(e) and 9(g)).

### A. The August 2003 Grievance

Sometime on or about August 14, 2003, Lindley was assigned to transport new vehicles from a storage facility at Richards Gebauer to the Claycomo, Missouri, Ford plant along the "city shuttle" route. The roofs of two vehicles Lindley was transporting grazed the underside of an unmarked bridge overpass on I-470 and U.S. 71 in Kansas City, Missouri. Consequently, Lindley was terminated on or about August 19, 2003 based on Allied's allegation that Lindley had violated Art. 40, Rule 1(a) of the CBA.

On or about August 28, 2003, the Union filed a grievance on Lindley's behalf protesting Lindley's discharge and requesting that Lindley be reinstated with full back pay and benefits. The Union attempted to resolve Lindley's August 2003 grievance informally and formally with Allied at a "prehearing meeting" as provided under the CBA. The Union was unable, however, to resolve the grievance at this level. Thus, the Union proceeded to process Lindley's grievance through the arbitration procedures of the CBA.

At the same time that the Union was processing Lindley's grievance, it was also processing the grievance of another Allied employee, John Kaul ("Kaul"). Like Lindley, Kaul had been discharged by Allied for damage caused to units he had been transporting when he struck the same bridge that caused the damage to the vehicles Lindley was transporting. The grievances of Kaul and Lindley were scheduled to be heard on the same day in September 2003 by the same arbitration panel sitting as the Central Automobile Transporters Joint Arbitration Committee.

The Union representative for both employees was C.B. "Doc" Conder ("Conder"). Conder decided to present Kaul's grievance first. The Union contends that he did so under the belief that Kaul's grievance presented a stronger case, since he had been employed longer and he had a better accident

record than Lindley. (Doc. #68, ¶ 11). Lindley contends that there was not a measurable difference between Lindley and Kaul's accident record. (Doc. #84, Resp. to Def's SOF ¶ 11). Conder felt that he had a better chance of getting a favorable decision from the Committee with Kaul's grievance, and that he could then use the Committee's decision as the basis for a settlement of Lindley's grievance. The Committee decided that Kaul had violated Art. 40, Sec. 1(a) of the CBA, but that he should be reinstated without backpay or benefits based upon mitigating circumstances, namely the fact that the bridge Kaul struck was unmarked.

Lindley understood that his case presented the same facts as Kaul's case. Lindley was also aware that his grievance was going to be heard by the same arbitration panel that had just decided Kaul's grievance. Lindley testified that he understood he would "probably not" get a more favorable decision from the arbitration panel than Kaul had received. (Lindley Dep. 106:19-22). Nevertheless, Lindley wanted to "go forward" with his grievance. (Lindley Dep. 106:23-24). Lindley claims that at the time he didn't know what the actual decision of the arbitration panel would be and he wanted to go forward because "there [had] never been anybody charged with hitting an unmarked structure or an unmarked bridge." (Lindley Dep. 106:25-107:4). In other words, Lindley believed that he had a precedent-setting grievance, notwithstanding the fact that the arbitration panel had just considered an identical grievance only moments earlier.

The Union settled Lindley's grievance on the same terms as Kaul's grievance. Thus, Lindley's discharge was rescinded and he was reinstated without backpay or benefits. The Union contends that Conder only recommended that Lindley accept the offer, but did not force him to do so. (Doc. #68, Ex. 1, ¶¶ 11, 12). Lindley contends that the Union left him no choice in the matter and settled his grievance notwithstanding Lindley's decision to go before the Committee and present his grievance. (Doc. #84, ¶

29). For purposes of summary judgment, the Union concedes that it must accept Lindley's version of the manner in which the Union settled Lindley's August 2003 grievance. Lindley asserts that the Union breached its duty of fair representation by settling Lindley's August 2003 grievance over Lindley's objections.

### B. The September 2003 Grievance

On September 18, 2003, Lindley again received a discharge notice from Allied. The notice alleged that Plaintiff had again violated Art. 40, Sec. 1(a) of the CBA. Allied alleged that on September 11, 2003, a unit being transported by Lindley had, again, struck the same bridge that Lindley had struck the previous month. The Union filed a grievance protesting Lindley's discharge.

The Union was unable to resolve Lindley's September 2003 grievance at the local level, either informally or formally at a pre-hearing meeting with the Company. Thus, the Union proceeded to process Lindley's grievance through the arbitration provisions of the contract. The Union presented Lindley's grievance to the Central Automobile Transporters Joint Arbitration Committee, which met in Detroit, Michigan. The Committee could not reach decision, however, and deadlocked between the employer-appointed members and the Union-appointed members. Because the Area Committee had deadlocked, the Union presented Lindley's grievance to the next available arbitration panel in November 2003, which was the National Joint Arbitration Committee. The National Committee also deadlocked between the employer-appointed members and the Union-appointed members.

The Union processed Lindley's grievance to the final arbitration panel available under the CBA, the Board of Arbitration. The Board met in Scottsdale, Arizona in November 2003. The Union's case was presented by Conder and Lindley also attended the meeting. Conder presented a written statement

as well as exhibits to the Board. Conder also argued Lindley's grievance orally before the Board. Lindley was allowed to speak on his own behalf before the Board.

Lindley challenges the volume and nature of the evidence Conder presented to the Board. Conder argued that Lindley's accident was not sufficiently serious to be classified as a "major chargeable accident" under the CBA and that Lindley's accident was the result of an equipment malfunction. In support of his contention that Lindley's accident was not sufficiently serious to be classified as a "major chargeable accident," Conder argued that no other driver involved in "overhead damage" had been permanently discharged. (Doc. #68, ¶ 25). Conder presented the specific case of Mike Miller, who was transporting a vehicle that struck the same U.S. 71 and I-470 overpass five days after Lindley's September 2003 accident. (Doc. #84, ¶ 46; Doc. #90, ¶ 46). Miller received no discipline in connection with that accident which was attributed to a mechanical malfunction. Id. The Union contends, and Lindley does not dispute, that Allied offered nothing to rebut Conder's argument that no other driver involved in "overhead damage" had been permanently discharged, as illustrated by the Miller case. (Doc. #68, ¶ 25, Doc. #84, Resp. to Def's SOF ¶ 25).

Lindley contends that Conder should have presented evidence of the number of instances of "overhead damage" that went without any or only slight disciplinary action and any related specifics. (Doc. #84, Resp. to Def's SOF ¶ 25). Lindley further argues that Conder should have argued that other more serious incidents were not deemed major or chargeable accidents justifying termination of employment. Id. Lindley contends that Conder should have obtained the personnel records of Allied drivers to show specific instances, including the striking of bridges, that had not been deemed either to be major, or chargeable, accidents subject to discipline or would not provide just cause for discharge. (Doc. #84, ¶¶ 43, 51, 52). Lindley argues that these "past practices of the parties" should have been presented to the

Board of Arbitration to demonstrate the parties' intent in interpreting "major chargeable accidents" under the CBA.  (Doc. #84, ¶ 45).

In support of his second argument that Lindley's accident was the result of an equipment malfunction, Conder presented statements of other employees who had driven the same trailer unit driven by Lindley on September 11, 2003.  (Doc. #68, ¶ 23).  These employees expressed their opinion that the trailer driven by Lindley "rode too high" and "needed to be loaded differently."  Id.  The Union also presented exhibits indicating that the trailer driven by Lindley on September 11, 2003 had been placed in the shop on previous occasions.  (Doc. #68, ¶ 24).  These exhibits included the vehicle maintenance records for the previous three years for tractor 7020, trailer 4620, the tractor-trailer operated by Lindley. (Doc. #84, ¶ 41, Doc. #90, ¶ 41).

Lindley contends that Conder should have presented the vehicle maintenance records "for all similar types of tractors and trailers utilized by Allied or any other such reports" rather than just presenting the vehicle maintenance records for the tractor-trailer unit operated by Lindley.  (Doc. #84, ¶ 41).  Lindley asserts that such reports would have shown widespread incidents of replacement of air leveling valves[2] and leveling arms by Allied on the same series of tractors and trailers and the series of rig operated by Lindley on September 11, 2003.  (Doc. #84, ¶ 42).  Lindley highlights the following information in these reports:

March 2002 – March 2005: 84 air leveling valves were replaced on all equipment.

_____

[2]The parties dispute whether the raising of load height can be caused by a malfunction of the air leveling valve.  According to Lindley's expert, Charles Weatherman ("Weatherman"), raising of the load height can be attributed to a malfunction of the air leveling valve due to contamination or wear. (Doc. #84, ¶ 37).  In contrast, the Union offers the opinion of Rick Repper, the mechanic who actually works on Allied trailers, who testified that air leveling valve malfunctions only cause trailer height to lower or remain stationary.  (Doc. #90, ¶ 37).  Viewing the facts in the light most favorable to Lindley, as this Court must do, the Court presumes that raising load height may be attributed to a faulty air leveling valve.

March 2002 – November 17, 2003 (date of Board of Arbitration hearing): 15 air leveling valves replaced on 4600 series trailers
2/3/04 – 3/18/05: 7 air leveling valves replaced on 4600 series trailers.

Id. Lindley asserts that the fact that 15 air leveling valves were replaced on 4600 series trailers from March 2002 to November 17, 2003 could have been used to rebut the statements made at the arbitration proceeding by then terminal manager Mitch Ledford ("Ledford"). Id. Ledford testified that over the prior three years in which Allied operated eleven 4600 series trailers, the fewest number of requests to adjust ride height was two in three years and the most was twelve in three years. Id. Allied found only sixteen other examples, not in the 4600 series, of requests to adjust ride height. Id. When asked about the Ledford testimony, Conder testified as follows:

> . . . [T]he company presented information that addressed most of the equipment, or much of the equipment in that series to show the – the levels and that the problems with air valves or air leveling system was minimal, and part of the rationalization as I recall was because they had gone back and looked at the others in that category and there may even have been one that had as many shop times as this one, but by far and large it was a relatively nonissue.

Id.

The Board of Arbitration sustained Lindley's discharge issuing the following decision:

> The grievant was employed as a truckaway driver at the Company's Kansas City terminal. He is protesting his discharge from employment on September 18, 2003. He was discharged for what the Company alleges was a major chargeable accident while on duty pursuant to Article 40, Rule 1(a) of the Central-Southern Supplemental Agreement which specifically provides that a major chargeable accident is cause for termination. The Union disputes that this was a major chargeable accident and also denies the grievant's culpability.

> On September 11, 2003, the grievant was working as a shuttle driver hauling units from [an] off-site storage facility to another customer. He struck the viaduct bridge which has a clearance of 15' 1 ½" causing damage. This was the third time that he struck that bridge. Approximately four weeks previously, he struck the same bridge twice and was discharged. After the Union intervened the discharge was reduced to a ten day disciplinary suspension.

The Union maintains that the grievant was not culpable because the air leveling system on the trailer malfunctioned. According to the grievant, he measured the load as 14' 10". The bridge clearance was 15' 1 ½". While the Union's evidence indicated that there could possibly be some slight variation in the trailer height, the evidence simply does not support a variation of 3 ½".

The Board sustains this discharge for two principal reasons: (1) The final accident on September 11, 2003 for which he was culpable; and (2) The two prior incidents that occurred within the previous month.

(Doc. #68, Ex. J).

### C.    *Appeal of the Board of Arbitration's Decision*

Following the Board of Arbitration's decision, Lindley expressed to the Union his desire to appeal the Board's decision to the U.S. District Court pursuant to § 301 of the LMRA. The Union declined to file a lawsuit challenging the Board's decision. The Union's decision not to file a lawsuit on Lindley's behalf was based on the advice of the Union's legal counsel who explained the Union's position to Lindley's attorney in written correspondence. The Union asserts that its decision was based upon its assessment of the difficult legal standards applicable to suits to vacate labor arbitration decisions. Furthermore, the Union contends that its decision not to challenge the Board of Arbitration's decision was based on its awareness that the CBA would require the Union to pay Allied's attorney fees if Allied was able to successfully defend the Board's decision. Additionally, the Union considers it to be its responsibility not to file unmeritorious challenges to arbitration awards.

Lindley claims that this decision was not made by a vote of the Board of the Union, but rather by the Secretary/Treasurer and business agent of the Union, Conder, based upon the verbal authority granted him by the Union's President. (Doc. #84, ¶ 56). Lindley asserts that the Board's decision is suspect because it ignored the "past practices" of the Union and Allied that incidents involving overhead damage are not considered "major chargeable accidents" sufficient to give rise to just cause for termination. (Doc.

#84).  Accordingly, Lindley argues that the Union has breached its duty of fair representation by not seeking review of this "blatantly unfair and palpably incorrect decision."  (Doc. #84).

## II.    Standard

The Union filed this Motion for Summary Judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.  According to this Rule, summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  When considering this Motion, the Court views all facts in the light most favorable to Lindley and gives him the benefit of all reasonable inferences.  *See* Prudential Ins. Co. v. Hinkel, 121 F.3d 364, 366 (8th Cir. 1997).  The Court will not weigh the credibility of the evidence, but rather will focus on whether a genuine issue of material fact exists for trial.  Roberts v. Browning, 610 F.2d 528, 531 (8th Cir. 1979).

The Union bears the burden of proving the absence of disputed material facts.  *See* Prudential Ins. Co., 121 F.3d at 366.  The burden then shifts to Lindley to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  If Lindley fails to establish a factual dispute on an essential element of his case, the Court will proceed to determine whether the Union is entitled to judgment as a matter of law.  *See* E.E.O.C. v. Woodbridge Corp., 263 F.3d 812, 814 (8th Cir. 2001).  To survive summary judgment, Lindley must make a sufficient showing concerning every essential element of his case on which he bears the burden of proof.  Osborn v. E.F. Hutton & Co., Inc., 853 F.2d 616, 618 (8th Cir. 1988).

The summary judgment rule is intended "to isolate and dispose of factually unsupported claims" and should be applied to accomplish this purpose.  Prudential Ins. Co., 121 F.3d at 366.  In the interest of

promoting judicial economy, summary judgment should be granted to prevent the trial of cases lacking a genuine issue of material fact. Inland Oil and Transp. Co. v. U.S., 600 F.2d 725, 728 (8th Cir. 1979).

## III. Analysis

Lindley has filed this action against the Union and Allied pursuant to § 301 of the LMRA. To prevail in this hybrid § 301 action, Lindley must prove two essential elements: (1) that Allied breach its collective bargaining agreement with the Union; and (2) the Union breached its duty of fair representation owed to Lindley. *See* Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 570-71 (1976). The Union argues that Lindley has failed to prove that it breached its duty of fair representation and, therefore, Lindley's § 301 claim fails as a matter of law.

To establish a breach of the Union's duty of fair representation, Lindley must prove that the Union's "handling of his grievance was perfunctory, arbitrary, discriminatory, or in bad faith." *See* Brown v. Trans World Airlines, Inc., 746 F.2d 1354, 1357 (8th Cir. 1984) *citing* Int'l Bhd. of Elec. Wkrs. v. Foust, 442 U.S. 42, 47 (1979); Vaca v. Sipes, 386 U.S. 171, 190-91 (1967). To show that the Union acted in a perfunctory manner, there must be evidence that the Union acted "without concern or solicitude, or gave plaintiff's grievance only cursory attention." Brown, 746 F.2d at 1357. "A union's conduct is arbitrary if, considering all the circumstances at the time of the union's action or inaction, 'the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." Smith v. United Postal Service, Inc., 96 F.3d 1066, 1068-69 (8th Cir. 1996) *citing* Beavers v. United Paperworkers Int'l Union, Local 1741, 72 F.3d 97, 100 (8th Cir. 1995) (citations omitted). "Mere negligence, poor judgment, or ineptitude on the part of the union is insufficient to establish a breach of the duty of fair representation." Smith, 96 F.3d at 1068 *quoting* Stevens v. Teamsters Local 600, 794 F.2d 376, 378 (8th Cir. 1986) (citations omitted).

Ultimately, the Supreme Court has recognized that "[a]ny substantive examination of a union's performance . . . must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities." Buford v. Runyon, 160 F.3d 1199, 1202 (8th Cir. 1998) *quoting* Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 78 (1991). Given these standards, the Eighth Circuit has recognized that demonstrating a breach of a union's duty of fair representation "is an especially difficult task." Smith v. McDonnell Douglas Corp., 107 F.3d 605, 607 (8th Cir. 1997).

### A.     The August 2003 Grievance

Lindley contends that the Union breached its duty of fair representation by accepting a settlement offer on Lindley's grievance, extended after the arbitration committee ruled on Kaul's grievance, over Lindley's objections. Lindley contends that he was not given a choice to present his grievance to the arbitration committee, but rather was forced to accept the arbitration committee's offer because Conder told Lindley that he didn't want to present Lindley's grievance to the committee. Lindley wanted Conder to present his grievance to the arbitration committee because he believed he had a precedent-setting grievance.

In Vaca v. Sipes, a landmark case construing a union's duty of fair representation, the Supreme Court recognized that although a union may not arbitrarily ignore a meritorious grievance in a perfunctory fashion, an individual employee does not have an absolute right to have his grievance taken to arbitration, regardless of the provisions of the applicable collective bargaining agreement. Vaca, 386 U.S. at 191 (emphasis added). "If the individual employee could compel arbitration of his grievance regardless of its merit, the settlement machinery provided by the contract would be substantially undermined, thus destroying the employer's confidence in the union's authority and returning the individual grievant to the vagaries of independent and unsystematic negotiation." Id. In Vaca, the Supreme Court ultimately concluded that "a

union does not breach its duty of fair representation, and thereby open up a suit by the employee for breach of contract, merely because it settled the grievance short of arbitration." Id. at 192.

Pursuant to the Supreme Court's ruling in Vaca, Lindley does not have an absolute right to have his grievance taken to arbitration. Accordingly, the Union did not breach its duty of fair representation merely because it refused to arbitrate Lindley's grievance. Furthermore, the Union did not arbitrarily decide not to present Lindley's grievance to the arbitration committee. Rather, Conder had just presented a nearly identical grievance to the arbitration committee involving an employee who had struck the same bridge which Lindley had struck. The arbitration committee decided that the employee had violated Art. 40, Sec. 1(a) of the CBA, but should be reinstated without backpay or benefits due to the fact that the bridge was unmarked. The committee then extended this same offer to Lindley. Conder knew that because the first employee had a better accident record, it was unlikely that Lindley would achieve a better result. Furthermore, Lindley himself admitted that he would "probably not" get a more favorable decision from the arbitration committee. Lindley's belief that he presented a precedent-setting grievance is unfounded as the arbitration committee had just heard a grievance involving an identical accident – overhead damage caused by the striking of an unmarked bridge overpass on I-470 and U.S. 71 – only moments before.

Adhering to the precedent of Vaca, the Eighth Circuit has held that "[a] union may screen grievances and press only those that it concludes will justify the expense and time involved in terms of benefitting the membership at large." Carnes v. United Parcel Service, Inc., 51 F.3d 112, 116 (8th Cir. 1995) quoting Griffin v. International Union, United Auto., Aerospace & Agric. Implement Wkrs. of Am., UAW, 469 F.2d 181, 183 (4th Cir. 1972). Conder, aware of the arbitration committee's decision in the first employee's case, determined that pursuing Lindley's grievance was not worth the Union's expense and

time and would not benefit the Union membership at large.  Accordingly, because Conder's decision not to present Lindley's grievance to the arbitration committee was well-informed, the Union did not breach its duty of fair representation with respect to Lindley's August 2003 grievance.

### B.    The September 2003 Grievance

Lindley further asserts that the Union breached its duty of fair representation by failing to present certain evidence at the Board of Arbitration hearing.  Conder presented two arguments at the Board of Arbitration hearing.  First, Conder argued that Lindley's accident was not sufficiently serious to be classified as a "major chargeable accident" under the CBA and offered the specific case of Mike Miller, whose employment was not terminated after he struck the same U.S. 71 and I-470 overpass, in support.  Conder further argued that no other driver involved in "overhead damage" had been permanently discharged.  The Union contends, and Lindley does not dispute, that Allied offered nothing to rebut Conder's arguments.

However, Lindley argues that Conder's representation was perfunctory and arbitrary because Conder failed to present specific evidence of the number of instances of "overhead damage" that went without any or only slight disciplinary action. To conclude that no other driver involved in overhead damage had been permanently discharged, it must be supposed that these drivers received very little, if any, discipline for their accidents.  Therefore, the evidence which Lindley claims Conder should have presented is not sufficiently material to have altered the result of the grievance process.  Although this evidence would offer further support for Conder's argument, the Union's representation cannot be adjudged "irrational" because of the Union's failure to present cumulative evidence in support of its argument. Particularly where the employer has not challenged the union's argument, as is the case here, a union cannot be found to have

breached its duty of fair representation by failing to present additional evidence in support of its argument.

In addition to the argument that Lindley's accident was not sufficiently serious to be considered a "major chargeable accident," Conder argued that Lindley's accident was the result of an equipment malfunction. In support of this argument, Conder offered the statements of other employees who had operated the same trailer driven by Lindley who opined that the trailer "rode too high" and "needed to be loaded differently than other units." Conder also presented the vehicle maintenance records for the previous three years for tractor 7020, trailer 4620, the tractor-trailer operated by Lindley, to demonstrate that it had previously been placed in the shop.

Lindley contends that Conder should have presented the vehicle maintenance records "for all similar types of tractors and trailers utilized by Allied or any other such reports," rather than just presenting the vehicle maintenance records for the tractor-trailer unit operated by Lindley. Lindley asserts that this evidence reveals "widespread incidents" of Allied's replacement of air leveling valves and leveling arms. Lindley highlights the following examples: from March 2002 to March 2005, Allied replaced 84 air leveling valves on all equipment; from March 2002 until November 17, 2003, the date of the Board of Arbitration hearing, Allied replaced 15 air leveling values on 4600 series trailers; finally, from February 3, 2004 to March 18, 2005, Allied replaced 7 air leveling valves on 4600 series trailers.

The Court begins by noting that the Board of Arbitration hearing occurred on November 17, 2003. Statistics regarding the replacement of air leveling valves and leveling arms beyond this date would not have been ascertainable at the time of the hearing. Therefore, the Union did not breach its duty of fair representation by failing to present evidence that did not exist at the time of the arbitration.

Furthermore, the Court fails to see the relevance of the repair records from tractor-trailer units which were not the same model as the rig operated by Lindley. Lindley has failed to show how the repair records of these tractor-trailer units establishes the likelihood that Lindley's rig suffered from an equipment malfunction. Lindley argues that the fact that 15 air leveling valves were replaced on 4600 series trailers from March 2002 to November 17, 2003 could have been used to rebut Ledford's testimony. Ledford testified that over the prior three years in which Allied operated eleven 4600 series trailers, the fewest number of requests to adjust ride height was two in three years and the most was twelve in three years. Comparatively, Allied found only sixteen other examples, outside of the 4600 series, of requests to adjust ride height. Allied was using this evidence in an attempt to establish that the 4600 series trailers did not suffer from a widespread mechanical defect causing load height to rise in transit because the repair requests for 4600 series trailers was commensurate with the repair requests for other trailers. Because similar accidents were not occurring with these other trailers, Allied was attempting to convince the Board of Arbitration that a mechanical defect was not the cause of Lindley's accident. How the fact that 15 air leveling valves were replaced on the 4600 series trailers over the 20-month period immediately prior to the arbitration hearing rebuts Allied's argument that ride height repair requests on the 4600 series trailers were commensurate with the repair requests for other trailers is not readily apparent and has not been explained by Lindley.

In Smith v. UPS, 96 F.3d at, the Eighth Circuit considered whether a union breached its duty of fair representation by failing to present certain evidence. Smith was terminated for failing a random drug test. Smith, 96 F.3d at 1067. Smith claimed that the union breached its duty of fair representation by failing to obtain certain laboratory information and reports concerning his drug test in order to challenge the test as unreliable and failing to hire an expert witness to attack the reliability of the drug test. Id. Smith

contended that his employer purposefully had him tested and then tampered with the results. Id. Affirming the district court's entry of summary judgment in favor of the employer[3], the Eighth Circuit concluded that the union "adequately represented Smith at all grievance hearings, presenting both oral and written arguments in his favor." Id. at 1069. The Eighth Circuit noted that the union did obtain laboratory records of Smith's drug test and used these records to challenge the reliability of the drug test administered by Smith's employer. Id. According to the Smith decision, "Whether the union should have obtained more records is a matter within the wide range of reasonableness afforded to a union in pursuing a grievance." Id.

Similarly, Conder presented the vehicle maintenance records for the previous three years for tractor 7020, trailer 4620, the tractor-trailer operated by Lindley, in support of his argument that Lindley's accident was attributable to an equipment malfunction. Lindley contends that Conder should have obtained and presented more records. Conder's decision not to present the vehicle maintenance records for other "similar" tractor-trailers or for the entire Allied fleet is a matter within the wide range of reasonableness afforded the Union when pursuing Lindley's grievance. Conder's decision to present only the most relevant evidence in support of his argument does not constitute perfunctory or arbitrary representation.

The Union represented Lindley at every stage of the grievance process by presenting written and oral arguments in Lindley's favor. Conder presented exhibits and testimonial and documentary evidence in support of his arguments. Conder refuted Allied's arguments and challenged Allied's evidence. Lindley testified that he believed Conder did a "good job of explaining" his case. (Lindley Dep. 152:2-3). Accordingly, the Court finds that the Union did not breach its duty of fair representation.

---

[3]The Hon. Fernando J. Gaitan, Jr., United States District Judge for the Western District of Missouri at Kansas City.

Lindley relies heavily on Thomas v. Bakery, Confectionary and Tobacco Workers Union Local #433, 826 F.2d 755 (8th Cir. 1987) in support of his position that the Union breached its duty of fair representation in the proceeding before the Board of Arbitration. The plaintiffs in Thomas were unionized employees of a bakery that was purchased by a competitor. Thomas, 826 F.2d at 756. Shortly after the asset sale, the unionized employees were laid off when the competitor closed its bakery and shifted its operations and its employees to the facility where the unionized employees were working. Id. The dispute centered on what seniority rights the acquiring bakery promised to the unionized employees of the target bakery under the purchase agreement. Id. at 758. The plaintiffs alleged that the union violated its duty of fair representation by failing to negotiate with the acquiring bakery to protect their seniority rights and by not fairly representing their interests at the arbitration which followed the lay-offs. Id. The jury entered a verdict in favor of the plaintiffs, but the district court granted judgment notwithstanding the verdict for the union and the employer. Id. at 756-57. The Eighth Circuit reversed the district court and reinstated the jury verdict concluding that there was sufficient evidence for the jury to conclude that the union breached its duty of fair representation at the arbitration. Id. at 764. Evidence was presented at trial that the Union's President promised to bring the purchase agreement to the arbitration, but then failed to do so. Id. at 761-62. There was further evidence that the attorney representing the plaintiffs at the arbitration hearing accepted the employer's interpretation of the purchase agreement and failed to make any investigation into the terms of the purchase agreement. Id. at 762.

Lindley asserts that Thomas stands for the principal that the failure of a union to request, obtain or introduce documents at an arbitration reduces the union's representation to a mere formality or perfunctory representation. (Doc. #84 *citing* Thomas, 826 F.2d at 755). Accordingly, Lindley argues that based on the holding in Thomas, the Union breached its duty of fair representation by failing to present evidence of

other more serious, culpable accidents that did not result in termination and the repair records for all tractor-trailer units in Allied's fleet.

The Court finds Lindley's interpretation of Thomas to be overly broad and further finds that Thomas is readily distinguishable from the circumstances of the present case. In Thomas, the union failed to introduce the purchase agreement which, in and of itself, would have resolved the underlying labor issue. Here, the evidence which Lindley asserts the Union failed to present is merely peripheral and does not definitively resolve Lindley's grievance. Furthermore, unlike the attorney representing the plaintiffs in Thomas who blindly accepted the employer's interpretations of the contract which formed the basis of the dispute, Conder conducted an independent investigation into Lindley's accident and offered evidence that incidents involving "overhead damage" did not constitute "major chargeable accidents" and Lindley's accident was the result of an equipment malfunction. Additionally, unlike the plaintiffs in Thomas, no representative or agent of the Union promised Lindley that they would bring exculpatory evidence to the Board of Arbitration hearing and failed to do so. Accordingly, unlike the union in Thomas which withheld critical documents and failed to conduct an investigation into an employee's grievance, the Union's representation in the present case was not perfunctory, cursory or beyond mere negligence.

Lindley also argues that the Tenth Circuit's decision in Webb v. EBF Freight System, Inc., 155 F.3d 1230 (10th Cir. 1998) supports his assertion that the Union breached its duty of fair representation. In Webb, the appellate court affirmed the jury's verdict in favor of the employee on the employee's claim that his union breached its duty of fair representation. The union-appointed attorney had agreed to obtain company documents that the employee believed would be helpful and interview a co-worker who could testify about the events leading up to the employee's discharge. Webb, 155 F.3d at 1236. However, the union-appointed attorney failed to obtain the documents and decided not to call any witnesses at the

grievance hearing. Id. The attorney also failed to review the evidence prepared by the employer prior to the hearing, failed to rebut the employer's characterization of certain critical evidence, and refused to submit the employee's allegation of retaliation. Id. On appeal, the union argued that it did not have an obligation to conduct its own investigation of the employee's grievance because the employee undertook to do the grievance investigation himself. Id. at 1241. The union further argued that it had no legal duty to conduct "some minimal investigation" of a grievance complaint. Id. The Tenth Circuit rejected these arguments finding that the union "breached its duty of fair representation by failing to undertake an adequate investigation *under the circumstances*." Id. (emphasis added). The same circumstances do not exist in the present case. Like Thomas, Webb is also inapposite because the record in the present case does not support a finding that Conder failed to take certain promised action and/or failed entirely to investigate Lindley's grievance.

Consistent with the holdings in Thomas and Webb, when a union representative promises to obtain certain key documents and fails to do so, the union's representation is considered perfunctory, cursory and beyond mere negligence and, thereby, violative of § 301 of the LMRA. Further illustrated by the Thomas and Webb decisions, when a union representative fails to conduct any investigation whatsoever into an employee's grievance and fails to make any attempt to rebut the evidence offered by the employer, the union has breached its duty of fair representation.

Here, the Union did not promise to obtain certain documentary or testimonial evidence and then fail to follow through. Furthermore, the record reveals that Conder conducted a competent investigation into Lindley's grievance. Through his investigation, Conder discovered that other employees were of the opinion that the trailer being operated by Lindley "rides too high" and "needs to be loaded differently than other units." Conder also obtained vehicle maintenance records for the relevant trailer for the prior three

years which revealed that the trailer had been placed in the shop on previous occasions. Finally, Conder found that no other driver involved in "overhead damage" accidents have been permanently discharged. Conder presented all of this evidence to the Board of Arbitration to rebut Allied's position that Lindley was properly discharged. Accordingly, Lindley's reliance on <u>Thomas</u> and <u>Webb</u> is misplaced and does not support the conclusion that the Union breached its duty of fair representation with respect to Lindley's September 2003 grievance.

### C. *Appeal of the Board of Arbitration's Decision to the District Court*

Finally, Lindley asserts that the Union breached its duty of fair representation by refusing to challenge the Board of Arbitration's decision in U.S. District Court pursuant to § 301 of the LMRA. Lindley claims that the decision not to pursue his appeal was not made by a vote of the Union's Board, but rather by Conder, as the Secretary/Treasurer and business agent of the Union, who had the verbal authority of the Union's President to make such a decision. Lindley asserts that the Board of Arbitration's decision should be appealed because it ignored the "past practices" of the Union and Allied that incidents concerning overhead damage were not "major chargeable accidents" sufficient to give rise to a just cause for termination.

The Union contends that it made the decision not to pursue an appeal of the Board of Arbitration's decision upon the advice of its legal counsel. The Union was aware of the formidable legal standards that it must satisfy to prevail in a suit challenging the Board of Arbitration's decision. A district court's review of an arbitration decision is "highly deferential." <u>International Broth. of Elec. Workers, Local Union No. 545 v. Hope Elec. Corp.</u>, 380 F.3d 1084, 1100-1101 (8th Cir. 2004). Accordingly, the "[t]he scope of judicial review of arbitration awards under collective-bargaining agreements is extremely limited."

So long as the arbiter's decision "draws its essence from the collective bargaining agreement," it must be enforced by the district court. Franklin Elec. Co. v. International Union, United Auto. Aerospace and Agr. Implement Workers of America (UAW), 886 F.3d 188, 192 (8th Cir. 1989). Where an arbitral decision does not draw its essence from the parties' underlying agreement, "the arbitrators, in effect, acted arbitrarily and dispensed their 'own brand of industrial justice' or acted outside the scope of their contractual authority." International Broth. of Elec. Workers, Local Union No. 545, 380 F.3d at 1100-1101 *quoting* Amalgamated Transit Union, Local 1498 v. Jefferson Partners, 229 F.3d 1198, 1200 (8th Cir. 2000) (internal citations omitted). "Such extra-contractual awards, however, are rare, and we do not refuse to enforce arbitration awards merely because a party may be able to identify some mistake that the arbitrators made in the resolution of a dispute concerning arbitrable subject matter under the agreement." International Broth. of Elec. Workers, Local Union No. 545, 380 F.3d at 1100. According to the Supreme Court, "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." Keebler Co. v. Milk Drivers and Dairy Employees Union, Local No., 471 80 F.3d 284, 287 (8th Cir. 1996) *quoting* United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 38 (1987).

Lindley has failed to present any authority that if the Board of Arbitration's decision would be appealed to the district court, he would be likely to succeed on the merits. Lindley fails to point to any evidence in the record which reveals that the Board of Arbitration's decision did not draw its essence from the CBA and the Board acted in an arbitrary manner, dispensing its own brand of industrial justice. As noted above, the Union may screen employee grievances the pursue only those that it concludes will justify the expense and time involved in terms of benefitting the membership at large. *See* Carnes, 51 F.3d at 116.

Appealing the Board of Arbitration's decision is particularly risky as the Union will be required to pay Allied's attorney fees if Allied prevails. Absent a showing that Lindley's appeal is meritorious, this Court finds that the Union did not breach its duty of fair representation by refusing to challenge the Board of Arbitration's decision in U.S. District Court.

## CONCLUSION

Lindley has failed to prove that the Union's handling of his grievances was perfunctory, arbitrary, discriminatory, or in bad faith. Rather, the Court finds that the Union adequately represented Lindley at all stages of the grievance process by presenting written and oral arguments in Lindley's favor, offering adequate testimonial and documentary evidence in support of those arguments, and sufficiently rebutting Allied's arguments and evidence. Like Lindley himself, this Court concludes that Conder did a "good job" of representing Lindley's interests. Although Lindley is recognizably disappointed in the ultimate decision of the Board of Arbitration, he has failed to prove that this adverse decision is the product of a breach of the Union's duty to fairly represent him. Accordingly, the Union's Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.

/s/ Gary A. Fenner
GARY A. FENNER, JUDGE
United States District Court

DATED: March 1, 2006